685 So.2d 1007 (1997)
Charles POMPEY, Petitioner,
v.
Ron COCHRAN, Sheriff of Broward County, and Department of Health & Rehabilitative Services of the State of Florida, Respondents.
No. 93-3181.
District Court of Appeal of Florida, Fourth District.
January 8, 1997.
*1008 *1009 Sharon Kung and Walter H. Honaman of Lawyers Collaborative, P.A., Boca Raton, for petitioner.
Linda Jaffee of the Law Offices of Milena Christopher, P.A., Fort Lauderdale, for Respondent-Department of Health & Rehabilitative Services of the State of Florida.
No appearance for Respondent-Ron Cochran, Sheriff of Broward County.

EN BANC
PER CURIAM.
We review this case en banc to consider important issues relating to the incarceration of a former spouse or parent who has failed to pay alimony or child support after having been found in civil contempt. This has led us to modify or recede from a prior decision of this court. We grant Charles Pompey's petition for a writ of habeas corpus, finding that Pompey's incarceration was unlawful because there was no evidence at all to support the trial court's affirmative finding that the petitioner had the ability to pay a purge amount of $22,100.
This case arises from a 1986 final judgment ordering Pompey to pay $60 per week in child support pursuant to a stipulation he entered with the Department of Health & Rehabilitative Services of the State of Florida (HRS). Pompey failed to make a single payment for nearly seven years. Then, in early May 1993, HRS filed a motion seeking to hold him in contempt for nonpayment of child support. The motion for contempt and notice of hearing stated:
YOU ARE HEREBY NOTIFIED that Petitioners shall apply for an Order adjudging you to be in contempt of this Court's previous Order by failure to pay support... as ordered. Petitioners will seek to hold you in contempt of Court for all arrears up to the date of the hearing.... You are required to attend this hearing or a writ of attachment may issue for your arrest.
.... [Motion also required production of income tax returns, W-2s, and financial affidavit]
FAILURE TO PRODUCE THE DOCUMENTS REQUESTED MAY LEAD THE COURT TO CONCLUDE THAT YOU HAVE FAILED TO REBUT THE PRESUMPTION THAT YOU HAVE THE ABILITY TO PAY YOUR SUPPORT OBLIGATIONS IN FULL. Register v. Pita, 546 So.2d 1162 (1st DCA 1989). THE BURDEN OF PROOF IS YOURS TO ESTABLISH YOUR INABILITY TO PAY.
The motion and notice were personally served on Pompey in Manatee County, where he resided. Pompey failed to attend the scheduled hearing before a hearing officer in Fort Lauderdale and has offered no excuse for his non-appearance.
After the contempt hearing, the hearing officer filled in the blanks of what appears to be a standard form for reporting the results of child support enforcement hearings. The officer found:
. . . .
2. Respondent failed to comply with the previous orders and/or final judgment of this Court to pay child support and is in arrears of said payments in the sum of $ 22,100 as of 5/18/93.
3. Respondent was served on 5/7/93 with notice of this hearing.
a. x By his/her non appearance fails to rebut the presumption of his/her ability to comply with the terms of the Court's orders and/or final judgment.
. . . .
4. Respondent has the present ability or assets to pay the purge amount set forth below.
. . . .

*1010 B. The Hearing Officer recommends the Court enter an Order approving the following:
1. Respondent is in willful contempt of Court based upon his/her failure to comply with the Court's orders and/or final judgment even though he/she had the ability to do so and presently has the ability to comply.
2. The arrears are determined to be $22,100 as of 5/18/93.
3. Respondent's contempt shall be punished as follows:
a. ___Respondent shall be incarcerated in the Broward County Jail for a period of 179 days commencing 6/10/93.
. . . .
c. x In the event Respondent does not purge of said contempt as provided herein on or before 6/9/93 a Writ of Attachment/Writ of Arrest and Commitment shall issue without further notice to Respondent to be brought before the undersigned after being brought into custody.
4. Respondent shall be released from the above sentence by payment of a purge in the amount of $ 22,100 (including fees) anytime prior or during the sentence....
For reasons unknown to us, the trial court did not enter a contempt order until July 14, over six weeks after the hearing. The trial court's order simply adopted the hearing officer's report by ratifying and approving the hearing officer's recommendations in all aspects. When Pompey failed to comply with the contempt order, another trial judge issued an order of arrest and commitment on August 18. The order of arrest specified that Pompey was to remain incarcerated until either the $22,100 purge amount was paid or the 179 day sentence was served.
Nearly two months after his incarceration, Pompey filed a petition for habeas corpus alleging that his incarceration was illegal because the requirements of Bowen v. Bowen, 471 So.2d 1274 (Fla.1985), were not met as petitioner did not have the ability to pay the purge amount set by the court. In responding, HRS noted that by failing to appear Pompey had waived any opportunity to be heard on the issue of his present ability to pay, thus running the very risk of the incarceration which was ordered. We ordered the trial court to hold a hearing on petitioner's ability to pay. As a result of the hearing, the purge amount was reduced to $212, the amount of Pompey's last unemployment check, and Pompey has since been released from custody.[1] Because of the significance of the issues regarding the extent of our own jurisdiction on habeas corpus relief in civil contempt proceedings, and the proper interpretation of Bowen in the conduct of civil contempt proceedings, we address the issues even though Pompey is no longer incarcerated. See In Interest of M.C., 567 So.2d 1038 (Fla. 4th DCA 1990).

I.
Article I, section 13 of the Florida Constitution states: "The writ of habeas corpus shall be grantable of right, freely and without cost. It shall be returnable without delay...." Under Article V, Section 4(b)(3), district courts of appeal may issue writs of habeas corpus returnable before the court or before any circuit judge within the territorial jurisdiction of the court. Thus, it is clear and undisputed that we have jurisdiction to entertain petitions for writs of habeas corpus.
Confinement contrary to constitutional principles of due process may be the subject of habeas corpus relief. See Ex parte Senior, 37 Fla. 1, 14-15, 19 So. 652, 653-54 (1896); Ex parte Earman, 85 Fla. 297, 315, 95 So. 755, 761 (1923); Vick v. Navarro, 567 So.2d 495 (Fla. 4th DCA 1990). "The writ [of habeas corpus] is venerated by all free and liberty loving people and recognized as a fundamental guaranty and protection of their right of liberty." Allison v. Baker, 152 Fla. 274, 275, 11 So.2d 578, 579 (1943).
As stated in Anglin v. Mayo, 88 So.2d 918 (Fla.1956): *1011 [The writ] is as old as the common law itself and is an integral part of our own democratic process. The procedure for the granting of this particular writ is not to be circumscribed by hard and fast rules or technicalities which often accompany our consideration of other processes. If it appears to a court of competent jurisdiction that a man is being illegally restrained of his liberty, it is the responsibility of the court to brush aside formal technicalities and issue such appropriate orders as will do justice. In habeas corpus the niceties of the procedure are not anywhere near as important as the determination of the ultimate question as to the legality of the restraint.
Id. at 919-20. The court also noted in Sneed v. Mayo, 66 So.2d 865 (Fla.1953):
"Jurisdiction of the person and of the subject matter is not alone conclusive [and] the jurisdiction of the court to make or render the order or judgment" depends upon due observance of the constitutional rights of the accused. 25 Am.Jur., Habeas Corpus, sec. 27, p. 161. See also Palmer v. Ashe, [342 U.S. 134, 72 S.Ct. 191, 96 L.Ed. 154].
Id. at 874. In our opinion, Bowen established constitutional criteria for incarceration for civil contempt, the violation of which can be addressed by petition for writ of habeas corpus. In his petition for writ of habeas corpus, Pompey alleged that his confinement was contrary to the requirements of Bowen in that the trial court ordered the incarceration of Pompey when Pompey lacked the ability to purge himself from the contempt.
This conclusion that habeas corpus is available to review incarceration which violates the requirements of Bowen is not a new pronouncement of the law. We ourselves have frequently reviewed the legality of incarcerative civil contempt orders by habeas. In Vick, we granted habeas relief to a civil contemnor where the order was not sufficient to support a finding of civil contempt and the record did not show that the contemnor had been given the constitutional protections required for a criminal contempt proceeding. In LeNeve v. Navarro, 565 So.2d 836, 837-38 (Fla. 4th DCA 1990), we granted habeas corpus relief, and discharged the petitioner where we reviewed the evidence presented in the contempt hearing and found that it failed to support the required Bowen finding that petitioner held the "keys to his cell." See also Cook v. Navarro, 611 So.2d 47 (Fla. 4th DCA 1992).
Other districts also review such orders by way of habeas. In Fennell v. Felton, 655 So.2d 1316 (Fla. 3d DCA 1995), the third district entertained a petition for writ of habeas corpus by a jailed civil contemnor who failed to pay his child support. The court reviewed the evidence and found that not only did the master not make a finding that petitioner had the present ability to purge himself of the contempt, but also the record would not support such a finding. In ordering his discharge from incarceration, the court stated:
In this case, the state concedes the allegation of the petition but implores us to reverse and remand the matter to the trial court to reduce the monetary purge and to reconsider the non-incarceration purge option to permit the trial court to consider possible criminal contempt proceedings. We decline to do so. The office and function of a writ of habeas corpus is to make a precise and definitive inquiry as to whether one's liberty is legally restrained. To honor the state's request would be to turn such an extraordinary proceeding into a general inquiry in the nature of appellate review.
Id. at 1318 (emphasis supplied); see also Roundtree v. Felton, 656 So.2d 584 (Fla. 3d DCA 1995) (granting habeas relief where evidence in civil contempt proceeding failed to show that petitioner had present ability to pay purge amount, relying on Bowen); Smith v. Felton, 654 So.2d 620 (Fla. 3d DCA 1995) (same); Sarron v. Crawford, 464 So.2d 644, 645 (Fla. 3d DCA 1985) ("Where ... there is neither an affirmative finding nor evidence in the record that the petitioner, at the time of his incarceration for civil contempt, had the ability to pay the amount ordered and thus obtain his release from incarceration, the incarceration, the aim of which is to coerce future compliance with the court's order, is unlawful, see Bowen ..., and *1012 the petition for writ of habeas corpus must be granted.")
The first district treated an appeal from an order of contempt and incarceration as a petition for writ of habeas corpus in Ganzel v. Ganzel, 520 So.2d 112 (Fla. 1st DCA 1988). There, the trial court recited evidence from a hearing conducted less than a month preceding the order of incarceration to determine that the contemnor had the present ability to pay the purge amount. The appellate court held that the facts concerning those earnings did not satisfy the Bowen requirement that the court make a separate, affirmative finding that the contemnor possess the ability to pay the purge amount. However, unlike Fennell, the court granted the writ with directions to immediately deliver the petitioner to a trial court judge for a hearing on petitioner's ability to pay the purge amount. If a hearing could not be immediately held, the petitioner was entitled to release pending such hearing.
In Cummins v. Cummins, 615 So.2d 173 (Fla. 5th DCA 1993), the fifth district also granted a petition for habeas corpus relief for a civil contemnor, concluding the petitioner's incarceration was illegal under Bowen where the record did not support a finding of the present ability to pay. In that case the appellate court granted relief even though there was no court reporter present at the contempt hearing and the petitioner appealed pro se. As in Ganzel, the court remanded the case to the trial court for further proceedings, including the consideration of other alternative methods to enforce the contempt order.
This review of case law both in our district and other districts convinces us that the district courts not only have jurisdiction, but, in the spirit of Anglin, take seriously their responsibility to strip aside formal technicalities where it appears a person is being illegally detained, and that justice requires the court to act. To the extent that our opinion in Goldstein v. Navarro, 590 So.2d 20 (Fla. 4th DCA 1991), can be read to indicate that habeas corpus relief is not available in this court to remedy a civil contempt confinement in violation of due process, we recede from it. Indeed, to construe Goldstein as specifying the sole remedy would interfere with habeas corpus rights guaranteed by the U.S. Constitution article I, section 9, and by our Florida Constitution article I, section 13.
We acknowledge that language in Driggers v. Pearson, 141 Fla. 256, 192 So. 881 (1940), might cast doubt on the availability of habeas corpus to attack the type of unlawful confinement complained of here. In Driggers, the supreme court determined that habeas corpus was not available to attack the validity of the order citing the petitioner for contempt:
In such collateral attack by habeas corpus proceedings in this type of case, practically the only question which can be raised is the jurisdiction of the committing court over the subject matter and the parties. Errors, if any, committed by the court in the exercise of its jurisdiction, may be remedied by appeal. Richey v. McLeod, Fla., [137 Fla. 281] 188 So. 228.
Id., 192 So. 881 (citations omitted). Driggers, decided long before Bowen, did not involve a challenge to the petitioner's imprisonment as being unconstitutional, whereas here, the challenge is that petitioner is being unconstitutionally detained.
Given the precedent we have reviewed above, we hold that we have jurisdiction to consider Pompey's petition. We turn now to the consideration of the merits of the issue.

II.
Contempt may be either civil or criminal. The distinction is important because the type of contempt determines both the procedures for adjudication and the type of punishment which may be imposed.
"`Criminal contempt is a crime in the ordinary sense.'" International Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 826, 114 S.Ct. 2552, 2556, 129 L.Ed.2d 642 (1994) (citation omitted). As the Florida Supreme Court has stated:
The purpose of criminal contempt ... is to punish. Criminal contempt proceedings are utilized to vindicate the authority of the court or to punish for an intentional violation of an order of the court. *1013 Bowen, 471 So.2d at 1277 (citations omitted). A sentence imposed for criminal contempt is punitiveto reassert the authority of the court and to "deter other like derelictions." Ex parte Grossman, 267 U.S. 87, 111, 45 S.Ct. 332, 334, 69 L.Ed. 527 (1925). Therefore, a court may sentence a criminal contemnor to imprisonment for a definite term or to pay a punitive fine. Bagwell, 512 U.S. at 827-29, 114 S.Ct. at 2557-58. These criminal sanctions may not be imposed unless a contemnor has been afforded the same constitutional due process protections to which criminal defendants are entitled. Bowen, 471 So.2d at 1277; Hicks on Behalf of Feiock v. Feiock, 485 U.S. 624, 631-32, 108 S.Ct. 1423, 1429-30, 99 L.Ed.2d 721 (1988). Among these constitutional safeguards are the right to be represented by counsel, the requirement that the offense be proved beyond a reasonable doubt, and the privilege against self incrimination. See Bowen, 471 So.2d at 1277; Bagwell, 512 U.S. at 826-27, 114 S.Ct. at 2556-57; Hicks, 485 U.S. at 632, 108 S.Ct. at 1429-30; Fla. R.Crim. P. 3.840.[2]
The purpose of civil contempt is not to punish, but to obtain compliance with a court order. Bowen, 471 So.2d at 1277; Parsons v. Wennet, 625 So.2d 945 (Fla. 4th DCA 1993). "Because incarceration is utilized solely to obtain compliance, it must be used only when the contemnor has the ability to comply. This ability to comply is the contemnor's `key to his cell.'" Bowen, 471 So.2d at 1277. Thus, a parent who is incarcerated for civil contempt for failure to pay child support is not entitled to court-appointed counsel because only those having the ability to pay may be incarcerated for civil contempt, and "`if the parent is indigent, there is no threat of imprisonment.'" Id. at 1278 (quoting Andrews v. Walton, 428 So.2d 663, 666 (Fla.1983)).
The ability to comply is the linchpin of civil contempt, and this principle underlies all assumptions concerning the protections afforded a civil contemnor. Because civil contempt sanctions are "Coercive and avoidable through obedience," they may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard, without the constitutional protections required in criminal cases. Bagwell, 512 U.S. at___, 114 S.Ct. at 2557; Bowen, 471 So.2d at 1277.
As our Florida Supreme Court emphasized in Andrews,
The sixth amendment guarantees provide the source of the constitutional protections accorded a defendant in a criminal contempt proceeding because of its punitive character; the defendant in a civil contempt proceeding, on the other hand, because he has the ability to control the act which causes release from jail, is guaranteed a proceeding which is "fundamentally fair" under the due process clause of the fourteenth amendment.
428 So.2d at 666 (citation omitted).
Where a civil contemnor is jailed without a purge condition that is within his power to accomplish, the sentence transforms into one for criminal contempt without having been preceded by any of the necessary constitutional safeguards. Bowen, 471 So.2d at 1277-78; Robbins v. Robbins, 429 So.2d 424, 431 (Fla. 3d DCA 1983); Hicks, 485 U.S. at 635 n. 7, 108 S.Ct. at 1431 n. 7.
With its use of jail as the instrument for enforcing orders, civil contempt is a hybrid proceeding unique in the law. Unlike the criminal law, where the Legislature sets the parameters of a permissible penalty and a jury typically decides the issue of guilt, contempt proceedings leave the judge responsible for adjudicating and sanctioning the contumacious conduct. See Bagwell, 512 U.S. at 830-31, 114 S.Ct. at 2559. The trial judge has broad discretion in imposing, reviewing, and reconsidering a contempt sentence. Because it centralizes so much power in one person, the contempt power is uniquely "liable to abuse." Id. *1014 The consequences of a civil contempt in the area of child support enforcement are potentially greater than those of a criminal contempt. Yet there are few procedural safeguards. Many individuals are unrepresented and may be unaware of their rightssuch as the right to periodic review of the contempt order and the right to request a hearing to demonstrate that they no longer possess the ability to pay. The consequences are even more dire for an indigent individual caught in a "Catch-22" situation: he cannot afford to hire an attorney, yet he has no right to an attorney because the court indulges in the assumption that no incarceration can take place unless the contemnor possesses the present ability to pay. See Bowen, 471 So.2d at 1278. Contempt jurisprudence must attempt to balance the need of a court to enforce its orders with the doctrine that a court's power to obtain compliance should be tempered by safeguards that ensure fundamental fairness.
The central critical holding of Bowen was that incarceration for civil contempt cannot be imposed unless the trial court finds that the contemnor has the present ability to purge himself of contempt. Bowen, 471 So.2d at 1277-78; see Hicks, 485 U.S. at 635 n. 7, 108 S.Ct. at 1431 n. 7. Bowen established what we interpret to be a two-step procedure for establishing civil contempt in family support cases. It first provided the procedure for determining if there has been a willful violation of a court order:
In these cases, the initial order or judgment directing a party to pay support or alimony is predicated on an affirmative finding that the party has the ability to pay. This initial judicial determination creates, in subsequent proceedings, a presumption that there is an ability to pay. In a civil contempt proceeding for failure to pay child support or alimony, the movant must show that a prior court order directed the party to pay the support or alimony, and that the party in default has failed to make the ordered payments. The burden of producing evidence then shifts to the defaulting party, who must dispel the presumption of ability to pay by demonstrating that, due to circumstances beyond his control which intervened since the time the order directing him to pay was entered, he no longer has the ability to meet his support obligations. The court must then evaluate the evidence to determine whether it is sufficient to justify a finding that the defaulting party has willfully violated the court order.
Bowen, 471 So.2d at 1278-79.
Then, as a second step which is a prerequisite to incarceration, the court went on to state:
Once the court finds that a civil contempt has occurred, it must determine what alternatives are appropriate to obtain compliance with the court order. If incarceration is deemed appropriate, the court must make a separate, affirmative finding that the contemnor possesses the present ability to comply with the purge conditions set forth in the contempt order. In determining whether the contemnor possesses the ability to pay the purge amount, the trial court is not limited to the amount of cash immediately available to the contemnor; rather, the court may look to all assets from which the amount might be obtained.
Id. at 1279 (emphasis added). Thus, the presumption of ability to pay which exists in the first step is not a substitute for the "separate, affirmative finding" of ability to pay required for incarceration. Moreover, the supreme court never discussed burden of proof issues in connection with the trial court's determination to incarcerate as the remedy for civil contempt. We do not read Bowen as compelling the contemnor to disprove a presumption that incarceration is the appropriate method for compliance.
Applying the process to this case, the original final judgment of support in 1986 created the presumption that Pompey had the present ability to pay his support obligation of $60 per week. HRS, as movant, also proved, and petitioner does not contest, that Pompey failed to make the payments, which as of the date of the hearing amounted to $22,100. The burden then shifted to Pompey to dispel the presumption of ability to pay as set forth in Bowen. Because Pompey did not appear at the hearing, he did not dispel the presumption. Therefore, the hearing officer *1015 concluded that Pompey had willfully violated the court order. Up until that point, the proceedings were in full compliance with Bowen.
Bowen then requires the trial court to determine what alternative is appropriate for addressing the civil contempt of failing to pay child support. Incarceration is an option only if the trial court "makes a separate, affirmative finding" that the contemnor possesses the present ability to comply with the purge amount. Id. at 1279. There is nothing in this record to show that the trial court had any evidence that Pompey could pay a purge amount of $22,100 and thus secure his release from incarceration.
The trial court must have some affirmative evidence before it that the obligor has the "keys to his cell" in his pocket. Otherwise, its order of incarceration is more than just coercive, and is thus an order of criminal contempt, without the required due process protections, including representation by an attorney. See Vick. If the contemnor must have the keys to the cell in his pocket, they cannot be made of paper presumptions when cold hard cash ($22,100 in this case) is required to get out of jail.[3]
The supreme court in Bowen did not address the dilemma faced by a trial court when the contemnor does not appear at the contempt hearing, and there is no evidence available to establish a purge amount. It is our understanding and experience that obligors routinely fail to appear at hearings on motions for contempt. Trial courts are faced with a difficult task of balancing the real and pressing need to protect the children of this state through the collection of unpaid child support against the constitutional right of the individual not to be "punished" without the full protections guaranteed in the Florida and United States Constitutions. Where the obligor fails to appear and the trial court decides to incarcerate and set a purge amount based on a presumption, there is a very real risk that an individual will be imprisoned on a civil contempt without possessing the "keys to his cell," thus allowing unconstitutional incarceration without the same due process protections afforded to typical criminal defendants. And while we may not be sympathetic to the recalcitrant parent who fails to pay child support, all courts are duty-bound to protect the constitutional rights of the individuals who appear before them.
Some circuits provide for the issuance of a writ of bodily attachment for a non-appearing obligor at a child support enforcement hearing. Then, when the obligor is brought before the court, a hearing can be immediately held as to the party's present ability to pay a purge amount. See, e.g., Fennell. In fact, a Broward County hearing officer's report gives the option for a trial court to issue a writ of bodily attachment, although one was not issued in this case. This procedure would permit the incarceration for civil contempt without running afoul of constitutional rights.
Standard procedure in Palm Beach County requires that after the court has ordered incarceration of the obligor and set a purge amount, the contemnor must be brought before a trial judge after being arrested in all cases, or appear before the judge within twenty-four hours of arrest, for the judge to determine whether a post-incarceration hearing is necessary as to the present ability to pay the purge amount. At that hearing, a trial court may adjust the purge amount to a sum which the contemnor has the present ability to pay. This also may avoid an unconstitutional incarceration.
However, where, as here, the petitioner was found in contempt, and the trial court determined that incarceration was the appropriate method to coerce compliance, the setting of a purge amount without any record showing that petitioner had the present ability *1016 to pay the purge amount transformed the civil contempt into a criminal sanction. Thus, petitioner's incarceration without compliance with all of the criminal due process protections was unconstitutional.

CONCLUSION
While we conclude that the availability of habeas corpus in cases such as this is consistent with Anglin and Bowen, we do, in light of Driggers, certify the following question of great public importance:
WHERE A DEFENDANT FAILS TO APPEAR AT A HEARING ON A MOTION FOR CIVIL CONTEMPT, AND AS A RESULT OF THE NON-APPEARANCE THE TRIAL COURT ENTERS AN ORDER OF INCARCERATION WITH A PURGE AMOUNT ARRIVED AT WITHOUT ACTUAL EVIDENCE OF ABILITY TO PAY, IS HABEAS CORPUS RELIEF AVAILABLE TO A JAILED CONTEMNOR?
We also consider the issue of our interpretation of Bowen as one of great public importance, and we certify the following question:
IN ORDER TO SUPPORT AN ORDER OF INCARCERATION FOR CIVIL CONTEMPT, DOES THE BOWEN PRESUMPTION OF ABILITY TO PAY, WHEN NOT REBUTTED BY A CIVIL CONTEMNOR WHO FAILS TO APPEAR AT A NOTICED HEARING FOR CONTEMPT, SATISFY THE SECOND BOWEN REQUIREMENT OF A SEPARATE AFFIRMATIVE FINDING OF ABILITY TO PAY THE PURGE AMOUNT SPECIFIED BY THE TRIAL COURT?
WARNER, POLEN, KLEIN, PARIENTE and GROSS, JJ., concur.
GLICKSTEIN, DELL and STEVENSON, JJ., concur specially.
KLEIN, J., concurs specially with opinion in which WARNER, PARIENTE and GROSS, JJ., concur.
GROSS, J., concurs specially with opinion in which WARNER, POLEN, KLEIN and PARIENTE, JJ., concur.
STONE, J., concurs in part and dissents in part with opinion in which GUNTHER, C.J., and FARMER and SHAHOOD, JJ., concur.
FARMER, J., dissents with opinion, in which GUNTHER, C.J., and SHAHOOD, J., concur.
GLICKSTEIN, DELL and STEVENSON, Judges, concurring specially.
We concur in the result reached by the majority; we join with them in receding from Goldstein v. Navarro, 590 So.2d 20 (Fla. 4th DCA 1991), and we concur in the certification of the questions.
KLEIN, Judge, specially concurring.
I agree entirely with the majority opinion. I am writing separately on an issue not addressed by the majority, section 61.14(5), Florida Statutes. The statute creates a presumption that the obligor has the "present ability ... to purge himself from the contempt" by virtue of the original order of support. The statute does not apply here, as the majority notes in footnote 2, because it was not passed until 1992, and the 1986 order was not entered pursuant to the requirements of the statute.
A presumption which shifts the burden of proof may be unconstitutional, a fact which our supreme court recognized in Bowen, 471 So.2d at 1279. I have concerns that the statutory presumption may be applied in such a way as to deny due process.
The "due process clauses of the Fifth and Fourteenth amendments set limits upon the power of congress or that of a state to make the proof of one fact or group of facts evidence of the existence of the ultimate fact on which guilt is predicated." Tot v. United States, 319 U.S. 463, 467, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519 (1943). Tot involved a rebuttable presumption regarding a fact which shifted the burden of coming forward with the evidence to the defendant, and the Court held that it was a denial of due process. In order for a rebuttable presumption (or inference) to be consistent with due process, "a rational connection must exist between the facts in the record and the ultimate fact to be presumed." Marcolini v. State, 673 So.2d 3, *1017 5 (Fla.1996), citing County Court of Ulster County v. Allen, 442 U.S. 140, 165, 99 S.Ct. 2213, 2228, 60 L.Ed.2d 777 (1979).
The Florida Supreme Court has applied the rational connection test to statutory rebuttable presumptions in civil cases. Straughn v. K & K Land Management, Inc., 326 So.2d 421, 424 (Fla.1976) (there must be a "rational connection" and a "right to rebut in a fair manner," for the presumption to be constitutional, citing Tot). In Bowen, after creating the presumption, the Florida Supreme Court cited one of the leading rational connection cases, Barnes v. United States, 412 U.S. 837, 843, 93 S.Ct. 2357, 2361, 37 L.Ed.2d 380 (1973). Bowen at 1279. It is thus clear that presumptions must pass the rational connection test, in order to comply with due process, regardless of whether the case is civil or criminal, and regardless of whether they are created by the legislature or the courts.
Historically confusion existed regarding the application of the rational connection test, but it was clarified by the United States Supreme Court in Allen, in which the Court concluded that rebuttable presumptions or inferences are evaluated for constitutionality under the rational connection test as applied to the facts in each case. The Florida Supreme Court recently followed Allen, and characterized the rational connection test as a "more likely than not" test. Marcolini, 673 So.2d at 6.[4]
Accordingly, a presumption that a contemnor has the ability to pay must, in order to not violate due process, pass the rational connection test. If a presumption was the basis for the finding that Pompey was able to pay the purge amount, $22,100, the presumption would have been unconstitutional as applied to the facts. There is no rational connection between the known fact, that Pompey could have paid $60 a week in 1986, and the presumed fact, that he could come up with $22,100 at the time he was incarcerated.
Trial judges should thus take care, where there is no evidence as to ability to pay, and they are using the presumption to set the purge amount, to make the amount low enough to pass the rational connection test. Otherwise the possibility exists that a person like Pompey will be denied due process. That is why the dissent's position, that habeas would never be available in an appellate court under these circumstances, is too harsh and inflexible for me.
WARNER, PARIENTE and GROSS, JJ., concur.
GROSS, Judge, specially concurring.
I agree with the majority opinion. I write separately to offer my perspective as a trial judge who has actually presided over the types of civil contempt hearings here at issue.
The problem with the dissent's approach is that it elevates procedure over people; it treats civil contempt as if it were the same as every other civil action. It is not. The consequence of an adverse finding in a civil contempt proceeding can be jail, not a piece of paper that can lead to a loss of assets. It is because this sanction is so unique in a civil case that contempt jurisprudence has sought to harness it by establishing procedures and rules to ensure that the incarceration is coercive rather than punitive, avoidable rather than mandatory.
I disagree with the dissent's worry that this case will make it difficult to enforce support judgments. The prospect of even a short jail stay usually extracts money out of those that have it. The majority opinion does not invalidate the practice of arresting contemnors who fail to appear at properly noticed contempt hearings. Unfortunately, many obligors do not appear at these hearings and arrest is necessary to secure their participation in the support process. As the *1018 majority noted, most circuits have developed local procedures to prevent what happened to Pompey from occurring. These practices entail the equivalent of a first appearance before a judge shortly after arrest to either hold a Bowen hearing or decide whether a full hearing is warranted. Such a procedure allows the trial court the flexibility to manage the case on an individual basis and then decide whether an additional post-incarceration hearing is warranted. That a timely post arrest hearing is an effective procedural safeguard was demonstrated in this case. Once Pompey received the hearing ordered by this court, the purge figure was lowered to $212.00, the amount of Pompey's biweekly unemployment check. This revised purge amount then allowed Pompey to secure his release.
Where a contempt hearing generates hard evidence of a contemnor's ability to pay, such as evidence of a salaried job or a recent win in the lottery, a contemnor's refusal to attend a contempt hearing will not result in the right to a de novo hearing at the contemnor's convenience. No one in this case has ever contended that the finding of Pompey's ability to pay was based on anything other than his failure to appear. This was not a case where the party seeking contempt made an evidentiary showing at the contempt hearing of the contemnor's ability to purge. This is also not a case where the trial court had a recent experience with the defaulting party by virtue of an ongoing divorce or child support proceeding.
We have not been informed about the existence of a uniform procedure in Broward County, similar to that in Palm Beach County, which mandates postarrest hearings. However, the trial judge who presided over the post-incarceration hearing in this case immediately recognized that Pompey had slipped through the cracks. She observed that:
I usually catch these big ones going through. For some reason I did not catch that the first time and some other judge signed the incarceration order. So I missed having it the second time. I usually catch them and reduce them to some rather low multiple of the amount that is being owed in child support.
Habeas corpus is a flexible remedy that must be available to someone who has slipped through the cracks of the system to ensure that their continued confinement is not offensive to Bowen.
A very real problem in this area is that most contemnors do not have attorneys, so they are unable to analyze and address their legal situation. Even where jail is the sanction imposed, a civil contemnor is not entitled to the appointment of an attorney, unlike a criminal defendant. Without a rule of procedure to regulate the contempt sanction, a pro se contemnor who has missed a hearing can be forced to analyze an area of law that befuddles many attorneys.
This area is ripe for clarification and organization by a rule of family procedure. Two goals of such a rule would be to provide uniformity in the procedures for handling non-support civil contempts and to deal with the problem confronting a trial court when a parent does not appear at a properly noticed contempt hearing. Such procedures could specifically authorize the issuance of a writ of bodily attachment for a non-appearing obligor. The rules could also require a timely post-arrest hearing, as is done in Palm Beach County, to ensure compliance with Bowen. The rules could also specify that the trial court advise unrepresented defendants of their legal rights, including the right to seek periodic review of a contempt finding before the trial court. See United States v. Jenkins, 760 F.2d 736, 740 (7th Cir.1985); King v. Department of Social and Health Servs., 110 Wash.2d 793, 756 P.2d 1303 (1988).
This court has long labored over this case, attempting to balance the strong public policy that children be maintained from the resources of their parents with the rights of an individual unable to comply with purge provisions not to be unconstitutionally imprisoned. It is my hope that our supreme court can assist us in striking the proper balance by clarifying the procedural pathways available in this area.
WARNER, POLEN, KLEIN and PARIENTE, JJ., concur.
*1019 STONE, Judge, concurring in part and dissenting in part.
Although there is precedent for the exercise of habeas corpus jurisdiction under these circumstances, I, nevertheless, dissent from our doing so. I would deny the petition and hold that habeas corpus relief should not be afforded by this court to a contemnor taken into sheriff's custody pursuant to a facially valid civil contempt judgment. Rather, the petitioner should seek habeas corpus relief, by way of demonstrating his present inability to purge, in the trial court. Habeas corpus should not be available to effectively negate an unappealed judgment or order of civil contempt, that is facially valid and entered by a court having jurisdiction, where the petitioner initially elected not to, or neglected to, challenge the evidentiary basis for the civil contempt order by an available remedy of direct appeal. Driggers v. Pearson, 141 Fla. 256, 192 So. 881 (1940). See also Taylor v. Chapman, 127 Fla. 401, 173 So. 143 (1937); McCrae v. Wainwright, 439 So.2d 868, 870 (Fla.1983). I would recede, if necessary, from any contrary implication in our previous opinions, LeNeve v. Navarro, 565 So.2d 836 (Fla. 4th DCA 1990); Cook v. Navarro, 611 So.2d 47 (Fla. 4th DCA 1992); or Vick v. Navarro, 567 So.2d 495 (Fla. 4th DCA 1990).
In my judgment, the procedure we should follow is that utilized in Goldstein v. Navarro, 590 So.2d 20 (Fla. 4th DCA 1991). To carry Goldstein a step further, I would treat a habeas corpus petition sought under these circumstances as being filed in the wrong court and would direct our clerk to transfer it to the clerk of the circuit court. If there is concern that a hearing might not be afforded in the trial court, relief by writ of mandamus is available to insure that the petition alleging unlawful confinement will be promptly heard. Any further relief by this court is then obtainable by direct appeal, in which there would be a more complete record and, both we and the trial court, would have the flexibility to consider a stay or other temporary relief. Such a result would be consistent with the recognition in Bowen v. Bowen, 471 So.2d 1274 (Fla.1985), that the burden of producing evidence as to inability to pay is on the defaulting party.
I cannot conclude that Petitioner has been deprived of due process. He has been afforded notice and every opportunity to be heard. Regardless of whether the contempt order was founded on a mountain of direct evidence or simply on the bare essentials, a default, and the application of a rebuttable presumption, it is valid on its face. Enforcement of the order's civil contempt provisions is not illegal where there was jurisdiction and Petitioner had an opportunity to contest it, to appeal, and is permitted to seek the attention of the trial court, as readily as he has petitioned this court, in order to demonstrate that he lacks the present ability to pay the purge. The issue then should not be one challenging the initial detention pursuant to a facially valid court order, but whether the confinement, absent payment of the initial purge amount, should continue. I note that there is no indication in this record that affording the trial court the first opportunity to review Petitioner's condition would be a useless act.
I concur in the certified questions. I also agree with the initial disposition of this cause, which was to remand for a trial court hearing.
GUNTHER, C.J., and FARMER and SHAHOOD, JJ., concur.
FARMER, Judge, dissenting.
In agreeing to issue this writ of habeas corpus, the plurality acknowledges that:
"Because civil contempt sanctions are `coercive and avoidable through obedience,' they may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard, without the constitutional protections required in criminal cases."
Maj. Op. at 1013. Notwithstanding, the plurality states that this "ordinary civil proceeding with notice and an opportunity to be heard" ended up punishing a contemnor rather than coercing him. In holding that Pompey's incarceration was unlawful, the plurality had to elevate an alleged failure of evidence into a constitutional deprivation. Their entire argument hinges on a determination that there was no evidence to establish a purge amount. To reach their conclusion, *1020 the plurality has rejected a rebuttable presumption of ability to pay approved by the supreme court. Thus, in granting the writ, the plurality has converted an ordinary evidentiary issue that should have been raised in an appeal into a constitutional issue, thereby permitting a collateral attack on an unappealed judgment.
Perhaps most important is the willingness of the plurality to have this court, rather than the trial court, grant the writ. As I understand supreme court precedent, it is for the trial court to grant habeas relief when the alleged constitutional defect turns, as here, on a disputed fact, i.e. the contemnor's ability to purge. The plurality has done so based upon petitioner's unsupported statement, presented for the first time in this court, that he lacked the ability to pay the purge amount when the contempt judgment was entered. They do not explain why this mere contention should be the basis for granting habeas in this court, an appellate court, when it was never sought to be made in the trial court. Indeed, the panel assigned to this case entered an order, just as we did in Goldstein v. Navarro, 590 So.2d 20 (Fla. 4th DCA 1991), transferring this case to the trial court to afford Pompey a hearing on his contention that he is unable to pay the purge amount.[5] If Pompey had filed this petition first in the trial court to seek an evidentiary hearing on his current ability to purge himself from the contempt, and if the trial court had denied him a hearing on the matter, he then could properly have sought mandamus in this court to compel the hearing, or even appealed that denial.
I enthusiastically support the use of habeas corpus to relieve incarcerations that are in violation of constitutional guarantees, such as the right to due process of law. As I will elaborate later, however, I do not find the circumstances of this case to amount to a violation of due process. At the same time, I readily agree that if Pompey had appeared at the contempt hearing and offered his own evidence and then timely appealed the contempt judgment in this case, he would clearly have been entitled to review on whether the evidence supported the amount of the purge provision. The failure to make use of the standard remedy of appeal has the consequence of finality, and habeas corpus is not available to avoid that consequence.
The plurality decision would make it more difficult for custodial parents to enforce a support judgment by contempt. With the remedy of habeas now at hand, few non-payers of support will appeal or even very likely trouble themselves to attend contempt hearings. When the non-payers are finally tracked down and brought into court, they will now raise by habeas corpus the sufficiency of the evidence to support the unappealed contempt judgment. I believe that this decision is a striking departure from settled use of the Great Writ.
The general principles for habeas corpus relief have been well settled by the supreme court. To be entitled to habeas relief, the contemnor must show that he is being held illegally, meaning he was confined in violation of the constitution. "The purpose of the ancient and high prerogative writ of habeas corpus is to inquire into the legality of a prisoner's present detention." McCrae v. Wainwright, 439 So.2d 868, 870 (Fla.1983); see also Frizzell v. State, 238 So.2d 67 (Fla. 1970); Sneed v. Mayo, 69 So.2d 653 (Fla. 1954). Moreover, habeas corpus should not be used as a vehicle to raise issues which should have been presented in trial court. McCrae, 439 So.2d at 870. Habeas corpus may not be used in place of a remedy by appeal. Hargrave v. Wainwright, 388 So.2d 1021 (Fla.1980) (habeas corpus may not be used as vehicle to raise for first time issues that petitioner could have raised on appeal). Thus, habeas corpus is not available to allow a court to examine the individual justice or merits of the detention. Shelton v. Coleman, 136 Fla. 625, 187 So. 266 (1939). The court's power to issue the extraordinary prerogative *1021 writ of habeas corpus must be exercised with extreme caution and only in a clear case. Taylor v. Chapman, 127 Fla. 401, 173 So. 143 (1937).
More pertinently, under the supreme court decisions, the writ does not lie in civil contempt cases arising from a refusal to pay support where the contemnor seeks to argue unappealed evidentiary or nonconstitutional, procedural errors made in the contempt proceeding. In Driggers v. Pearson, 141 Fla. 256, 192 So. 881 (1940), the court considered a petition attacking the merits of an unappealed civil contempt order for nonpayment of temporary alimony in a pending divorce case. The contemnor there, like the contemnor here, sought to argue that the contempt order was in error for failing to make a specific finding of his ability to comply with the support order. In determining that the relief was not available under these circumstances, the court held:
"if there was any error in [the determination of the contemnor's ability to pay], an appeal could have been taken. [c.o.] The order thus made cannot be attacked collaterally for mere error, if there was error." [e.s.]
192 So. at 882. As the court explained:
"In such collateral attack by habeas corpus proceedings in this type of case, practically the only question which can be raised is the jurisdiction of the committing court over the subject matter and the parties." 192 So. 881. The plurality forthrightly acknowledges that it is unable to distinguish Driggers and that Driggers has not been specifically overruled by our supreme court.
The majority overrules our earlier decision in Goldstein, implying that we held in that case that habeas corpus relief was not available to remedy a civil contempt incarceration that resulted from a deprivation of due process. I do not read such a holding, implied or express, in that case. Goldstein was expressly based on Driggers, which held that habeas corpus is not available in the circumstances presented thereand in this case to attack ordinary appealable errors in a contempt judgment. I would not recede from Goldstein because I think it is correct. I would recede, however, from any holding in Cook v. Navarro, 611 So.2d 47 (Fla. 4th DCA 1992), Vick v. Navarro, 567 So.2d 495 (Fla. 4th DCA 1990), and LeNeve v. Navarro, 565 So.2d 836 (Fla. 4th DCA 1990), that habeas corpus may be used to mount a collateral attack on the merits of an unappealed order of confinement for civil contempt that has become final.
The plurality suggests that Goldstein is contrary to the supreme court's holding in Bowen v. Bowen, 471 So.2d 1274 (Fla.1985). But Bowen was an appeal. Bowen does not address the precise issue raised and decided by the plurality. Bowen did not involve a later attempt to use habeas corpus to review the sufficiency of the evidence to support the purge provision in the unappealed contempt order. Bowen decided only when and how civil contempt incarceration may be employed by trial judges to coerce support payments.
In reaching their conclusion, the plurality dances around Bowen in a "two-step" gavotte. They do so by carving a specific paragraph from Bowen into two parts, as though it were entirely separate sections in a multiple-issue opinion. From this division, the plurality concludes that "the presumption of ability to pay which exists in the first step is not a substitute for the `separate affirmative finding' of ability to pay required for incarceration." Maj. Op. at 1012. The paragraph the plurality has separated was actually written in Bowen as follows:
"To avoid confusion, we believe it appropriate to address the correct procedure for establishing civil contempt in family support matters. In these cases, the initial order or judgment directing a party to pay support or alimony is predicated on an affirmative finding that the party has the ability to pay. This initial judicial determination creates, in subsequent proceedings, a presumption that there is an ability to pay. In a civil contempt proceeding for failure to pay child support or alimony, the movant must show that a prior court order directed the party to pay the support or alimony, and that the party in default has failed to make the ordered payments. The burden of producing evidence then shifts to the defaulting party, who must dispel *1022 the presumption of ability to pay by demonstrating that, due to circumstances beyond his control which intervened since the time the order directing him to pay was entered, he no longer has the ability to meet his support obligations. The court must then evaluate the evidence to determine whether it is sufficient to justify a finding that the defaulting party has willfully violated the court order. Once the court finds that a civil contempt has occurred, it must determine what alternatives are appropriate to obtain compliance with the court order. If incarceration is deemed appropriate, the court must make a separate, affirmative finding that the contemnor possesses the present ability to comply with the purge conditions set forth in the contempt order. In determining whether the contemnor possesses the ability to pay the purge amount, the trial court is not limited to the amount of cash immediately available to the contemnor; rather, the court may look to all assets from which the amount might be obtained."
471 So.2d at 1278-79.
The entire theme of Bowen is the use of the remedy of incarceration, not some lesser remedy as to which the Bowen measures are unnecessary. The obvious purpose of the Bowen paragraph was to provide a single procedure for trial judges to impose incarceration in civil contempt support cases, using the support judgment as the fulcrum. It does not separate the initial presumption from the ability to purge contempt because that presumption is the very heart of Bowen. Yet the plurality separates the fulcrum from the lever, so that the one may not be used with the other. They conclude that the presumption of ability to pay may not be used to fix the purge amount.
Thus, the essential problem with the plurality's reasoning is its inconsistency with the supreme court's careful placement of the burden on the contemnor to prove inability to purge. Bowen clearly imposes on the obligor the burden to offer evidence that he lacks the ability to purge himself of the contempt by paying the support due. It states specifically that the obligor has the burden of going forward with the evidence to show the lack of ability to pay support. Bowen then permits the trial judge to consider the same evidence to decide whether incarceration should be employed to compel payment. Yet, under the plurality's reasoning, the proponent of contempt cannot rely on the presumption for the ability to purge, and now has the burden to present additional evidence showing ability to purge.
The plurality reads some difficulties into the application of civil contempt that, I believe, a reasoned analysis does not support.[6] They argue that there are "few procedural safeguards" in civil contempt, contending that many prospective contemnors are unrepresented and "may be unaware of their rights." The short answer is that every citizenincluding those who default in the payment of supportis presumed to know the law. When a defaulting payer of support has been charged with contempt, the prospective contemnor presumptively knows of Bowen. Equally, he knows that he may be incarcerated if he does not dispel the presumption with evidence showing his inability to comply.
I do not see the Bowen presumption as a "paper" one. The presumption is a function of the finality of the support judgment, not just an ordinary evidentiary one. See Faircloth v. Faircloth, 339 So.2d 650, 652 (Fla. 1976) ("This burden of proof is cast upon him not by mere presumption of law, which vanishes upon the introduction of any evidence to the contrary (Locke v. Stuart, 113 So.2d 402 (Fla.1st DCA 1959); Leonetti v. Boone, 74 So.2d 551 (Fla.1954)), but by the court's decree which created the obligation to pay. That decree, long since final and therefore invulnerable, is itself a finding that, as of the moment of its entry, Mr. Faircloth had the ability to make the required payments."). Bowen receded from Faircloth in part, but not as to that which I have just quoted.
*1023 The plurality says that "[t]he trial court must have some affirmative evidence before it that the obligor has the `keys to his cell' in his pocket." [e.s.] Maj. Op. at 1015. Bowen does not say that. Instead, it says that "the court must make a separate, affirmative finding that the contemnor possesses the present ability to comply with the purge conditions set forth in the contempt order." [e.s.] 471 So.2d at 1278. There is a difference between a requirement for an affirmative finding and for affirmative evidence. Bowen permits the trial court to employ a presumption of ability to pay and then transfers to the obligor the burden of going forward with the evidence.
I do not really think there is any "dilemma" or "catch-22" facing a trial judge when, in spite of notice, the obligor does not appear at the contempt hearing. All that is necessary is that the judge receive evidence of the judgment requiring the support payments and evidence of nonpayment. That leads to the presumption that the obligor has the ability to pay and has willfully defaulted. Hearing no contrary evidence, the trial judge faces a straightforward evaluation of the presumption and initial evidence. Notice of the contempt hearing and the ability to be heard at that hearing more than satisfy the fundamental fairness and due process to which Pompey was entitled if he was to be incarcerated for civil contempt. Andrews v. Walton, 428 So.2d 663 (Fla.1983). When the contemnor is finally taken into custody, if he can show a then present inability to pay, Bowen means that he need then seek a hearing before the trial judge to establish that inability.
The plurality asserts that when obligors fail to respond to notice and to attend the contempt hearing, there is a:
"very real risk that an individual will be imprisoned on a civil contempt without holding the `keys to his cell,' thus allowing unconstitutional incarceration without the same due process protections afforded to typical criminal defendants."
Maj. Op. at 1015. But this circumstance does not result in a deprivation of due process. The Bowen procedure was deliberately designed to provide procedures, comporting with due process, that would avoid incarcerating a non-payer of support who lacks the ability to pay. But when the obligor himself refuses or fails to make use of those procedures, as is true in this case, I do not believe that it can fairly be said that his incarceration has resulted from a failure of the process. It is obviously a failure of the individual, not the process. As I indicated earlier, because contemnors will now have the right to use habeas to review the unappealed contempt order, they have no reason to attend the contempt hearing or to appeal any judgment resulting from it.
So far as I am aware, our law has almost always treated a party's failure to attend a duly noticed hearing as an abandonment of the right to contest the sufficiency of the evidence to support the judgment emerging from the hearing. Indeed this principle seems to me to have especial application in support enforcement cases. The practical effect of the plurality's holding will encourage defaulting obligors not to attend the original contempt hearing by permitting them to mount a collateral attack on the unappealed contempt judgment. It will also allow the contemnor to further delay enforcement of the support judgment, much to the detriment of children. Additionally, it will increase the costs and expenses of those seeking to enforce the obligation and add unnecessary hearings to the court system.
The plurality says that a trial judge may, without a purge provision, properly issue a writ of bodily attachment and arrest a "non-appearing obligor" when he fails to attend the contempt hearing. The plurality says that "this procedure would permit the incarceration for civil contempt without running afoul of constitutional rights." Maj. Op. at 1015. That seems to me to be quite inconsistent with Bowen. Bowen holds that a contemnor may be incarcerated for civil contempt only when he has the ability to end his incarceration by complying with the order. But if there is no purge provision, how will the contemnor comply? For when the contemnor is arrested far away from the county where the case is pending, it may be several days before he can be brought before the contempt judge. He will have no way of purging while he is being held and transported.
*1024 Thus while the plurality finds that Pompey was illegally incarcerated because there was no "affirmative" evidence of ability to purge, apparently they find no constitutional impediment to arresting and incarcerating him without any purge provision at all!
I disagree with the plurality's unsupported assertion that section 61.14(5)(a), Florida Statutes (1995), is not applicable to this case.[7] They reason that, because the child support judgment was entered in 1986 before this statute was adopted in 1992, it may not be applied in this case. In so doing, they have overlooked subsection (3) of section 61.14, which states that "[this section is declaratory of existing public policy and of the laws of this state]." [e.s.] The term "existing public policy" quite plainly refers to Bowen and its express presumption of ability to purge, as well as its placement of the burden on the contemnor to prove the contrary.
Moreover, as disclosed by its title, section 61.14 is undeniably a remedial statute. ("Enforcement ... of support, maintenance, or alimony agreements or orders." [e.s.]) It is well established that remedial statutes operate retrospectively. State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55 (Fla.1995) (procedural or remedial statute acts retrospectively); City of Orlando v. Desjardins, 493 So.2d 1027 (Fla. 1986) (remedial statute can and should be retroactively applied in order to save its intended purpose). The plurality's failure to apply section 61.14 in this case thus seems contrary to controlling supreme court precedent.
Without saying how, the plurality states that the support judgment does not "comply with the terms of" section 61.14. I assume they refer to the omission of a finding in the judgment that petitioner has the "imputed or actual present ability to comply with the order." Even conceding that the support judgment lacks an express finding on ability to pay, I would still apply the statute because the judgment was a consent judgment. Petitioner agreed to pay $60 per week in child support. Consent is an express admission of ability to pay what one has agreed to pay. The consenting payer should not be heard after defaulting in payment to say that his agreement is unenforceable because it failed to state the income or assets by which the the agreed payments will be made.
By concluding that the evidence was not sufficient to support the contempt judgment, the plurality obliterates any distinction between ordinary appellate review and the extraordinary writ of habeas corpus. In the end, Pompey's right to petition the trial court for habeas corpus provided a sufficient remedy if, when he was finally incarcerated, he did not have the ability to comply with the purge provision in the contempt order. There will always be controversies over whether the jailed contemnor actually possesses the ability to pay the purge amounts. Those factual controversies are, as they always have been, for resolution by the trial court, subject to review on direct appeal.
Because the plurality's rationale appears to be contrary to Hoffman v. Jones, 280 So.2d 431 (Fla.1973), and the decision makes it significantly more difficult and costly to compel defaulting payers to comply with their obligation to pay support, I do join in the plurality's certification to the supreme court.
GUNTHER, C.J., and SHAHOOD, J., concur.
NOTES
[1] At the hearing ordered by this court, HRS presented no evidence that Pompey had the present ability to pay the purge amount of $22,100 or that he ever had that amount of money. The testimony established that Pompey had been unemployed for at least a year and unemployment checks were his only source of income. He did not own a car, bank account or other assets.
[2] Criminal contempt sanctions are available for willful noncompliance with a court order, but such proceedings must be instituted by serving an order to show cause and affording a hearing after notice is given to the defendant, at which time the defendant has an opportunity to defend the charge of contempt. The procedure is governed by Florida Rule of Criminal Procedure 3.840 on indirect criminal contempt. See Bowen, 471 So.2d at 1279.
[3] Section 61.14(5), enacted in 1992, attempts to fill the gap that Bowen leaves in determining the purge amount. That statute creates a presumption that an obligor has the "present ability ... to purge himself or herself from the contempt" flowing from the entry of the original order of support providing for periodic support payments. Because the original order of support in this case was entered prior to the enactment of section 61.14(5), and the order does not comply with the terms of that section, we are not called upon to consider its application to this case. Moreover, neither party has argued that the statute applies.
[4] A mandatory rebuttable presumption which requires the trier of fact to presume an element of a crime upon proof of a basic fact, unless the defendant comes forward with evidence to rebut, violates a criminal defendant's due process rights because it relieves the state of the burden of proof. Marcolini, 673 So.2d at 4, citing Francis v. Franklin, 471 U.S. 307, 313-15, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985). If section 61.14(5) were a criminal statute and required the trial court to presume ability to pay, it would be arguable that the presumption was facially unconstitutional. This, however, is a civil proceeding.
[5] Pompey also filed a class action seeking damages and injunctive relief in federal court attacking the procedures used in this case. The federal district court dismissed the case on abstention grounds, and the Eleventh Circuit affirmed the abstention. Pompey v. Broward County, 95 F.3d 1543 (11th Cir.1996). I disagree, however, with the Eleventh Circuit's assertion that Pompey "obtained habeas relief" in this court. 95 F.3d at 1551. In fact, the writ has been granted for the first and only time by the majority in today's opinion.
[6] There is an undertone in the plurality opinion of a concern for contemnors like Pompey languishing forgotten in a debtor's prison, like some Chateau d'Yf. They seem to ask, like Marullus, "O you hard hearts, you cruel men of Rome, Knew you not Pompey?" W. Shakespeare, Julius Caesar, I, ii. But it seems to me that if Pompey languished in a prison, it was because he failed to do something, not because the system failed him.
[7] See § 61.14(5)(a), Fla. Stat. (1995) ("If the obligor subsequently fails to pay alimony or support and a contempt hearing is held, the original order of the court creates a presumption that the obligor has the present ability to pay the alimony or support and to purge himself or herself from the contempt.").